2003-NMCA-118

77 P.3d 560

John PALMER, Delilah McGuire, and Lois Anderson, individually and on behalf of all other similarly situated persons, Plaintiffs–Appellants,

v.

ST. JOSEPH HEALTHCARE P.S.O., INC., St. Joseph Healthcare System, and Catholic Health Initiatives, all corporations, Defendants–Appellees.

No. 22,728.

Court of Appeals of New Mexico.

July 28, 2003.

Certiorari Granted, No. 28,233, Sept. 15, 2003.

Michael C. Parks, Senior Citizens Law Office, Inc., Albuquerque, NM, for Appellants.

Charles A. Pharris, Gary J. Van Luchene, Keleher & McLeod, P.A., Albuquerque, NM, for Appellees.

## OPINION

JONATHAN B. SUTIN, Judge.

{1} In this appeal, we address federal preemption in Medicare Plus Choice pro-

grams, known as M+C programs. Defendant St. Joseph Healthcare P.S.O., Inc. (St.Joseph) operated an M+C program under contract with a federal agency known as the Health Care Financing Administration (HCFA).[1] Plaintiffs, including the certified class, sued St. Joseph and related entities (Defendants) for damages and declaratory and injunctive relief alleging misrepresentation by St. Joseph in regard to M+C program benefits. Plaintiffs appeal a summary judgment dismissing their action on the ground of express federal preemption and also on the basis of conflict preemption on the ground that Defendants' compliance with both state law and directions of the regulatory agency would have been impossible under the circumstances. We reverse.

## BACKGROUND

### A. Preliminary: The Posture of the Case on Appeal

{2} For the most part, we set out the facts as recited by Defendants in their motion for summary judgment. Although Plaintiffs argued in their summary judgment response and now argue on appeal that Defendants' recitation of the facts is not accurate in certain respects, Plaintiffs failed below to properly challenge Defendants' asserted facts and to request the district court to deny summary judgment on the ground that genuine issues of material fact existed. Plaintiffs, as well, fail on appeal to seek reversal of the summary judgment on the ground genuine issues of material fact exist. We therefore address the facts according to the procedure agreed to and followed by the parties. *See Barncastle v. Am. Nat'l Prop. & Cas. Cos.,* 2000–NMCA–095, ¶ 5, 129 N.M. 672, 11 P.3d 1234 (stipulated facts); *Barnae v. Barnae,* 1997–NMCA–077, ¶ 14, 123 N.M. 583, 943 P.2d 1036 (attorney representations); *Gonzales v. Pub. Employees Ret. Bd.,* 114 N.M. 420, 422, 839 P.2d 630, 632 (Ct.App.1992) (agreement that facts were not in dispute); *see also Montano v. Allstate Indem. Co.,* 2003–NMCA–066, ¶ 7, 133 N.M. 696, 68 P.3d 936 (citing foregoing cases and reviewing summary judgment de novo due to agreed-on

---

**1.** Effective June 14, 2001, HCFA was renamed "Centers for Medicare and Medicaid Services." 42 C.F.R. § 400.200 (2002).

posture of case on appeal); *Ontiveros Insulation Co. v. Sanchez*, 2000–NMCA–051, ¶¶ 8–9, 129 N.M. 200, 3 P.3d 695 (distinguishing the standard of review applicable to judgments "on the merits" as opposed to "summary judgment" in case decided on cross-motions for summary judgment).

### B. Background on Medicare

{3} Among its various modifications to Medicare, as part of the fiscal 1997 budget bill, Congress established the M + C program. *See* Balanced Budget Act of 1997(BBA), Pub.L. No. 105–33, 111 Stat. 251, 275–328 (codified at 42 U.S.C. §§ 1395w–21 to w–28). "Participation in the [M + C] [p]rogram is conditioned on providers offering basic Medicare benefits, meeting certain other statutorily defined criteria, and neither charging more in premiums nor furnishing less in supplemental benefits than the levels established through regulation by the Secretary of Health and Human Services (the Secretary)." *Massachusetts Ass'n of Health Main. Orgs. v. Ruthardt*, 194 F.3d 176, 178 (1st Cir.1999) (citing §§ 1395w–22, w–24 to w–26).

{4} Under the M + C program, eligible individuals (members) are entitled to elect to receive Medicare benefits through a Medicare + Choice plan of health insurance offered by a Medicare + Choice organization (M + C organization), which includes provider-sponsored organizations known as PSOs. § 1395w–21(a)(1)(B), (a)(2)(A); 42 C.F.R. § 422.2 (2000); *see* § 1395w–25(d). In addition to receiving funding from Medicare for M + C programs, M + C organizations charge their enrollee beneficiaries (members) a combination of monthly premiums and co-pays for various benefit plans. M + C plans typically provide greater benefits than those provided under traditional Medicare. *See, e.g., Hofler v. Aetna U.S. Healthcare of Cal., Inc.*, 296 F.3d 764, 766 (9th Cir.2002) (*per curiam*).

{5} HCFA is the administrative subdivision of the United States Department of Health and Human Services that directly administers the entire Medicare program. *McCall v. PacifiCare of Cal., Inc.*, 25 Cal.4th 412, 106 Cal.Rptr.2d 271, 21 P.3d 1189, 1193 (2001); *Brogdon v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1327 (N.D.Ga.2000). In order to operate M + C plans, M + C organizations must have a contract with HCFA. The contract and plan benefits customarily run for a calendar year.

{6} During 2000, St. Joseph, a PSO, operated an M + C program under contract with HCFA, providing members a combination of Medicare benefits. However, in July 2000, St. Joseph decided to withdraw as of December 31, 2000, from the M + C market due to low reimbursement rates and high costs. St. Joseph notified its members of this decision in October 2000. In that notice, members were informed of their health care options. Other M + C organizations in the United States either withdrew from the program or drastically altered their plans.

{7} Congress acted to alleviate this health care concern. It enacted Title VI of the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), Pub.L. No. 106–554, 114 Stat. 2763. BIPA provided for increased reimbursement rates and allowed M + C organizations, such as St. Joseph, that had not renewed their contracts with HCFA, to continue their participation in the program. In addition, BIPA allowed such M + C organizations, including St. Joseph, which had refrained from submitting proposed rates and benefits for approval by HCFA for 2001, to revise its rates and benefits. *See* BIPA, § 604(b).

{8} BIPA was signed into law on December 21, 2000. In response, St. Joseph decided to rescind its withdrawal from the program and to continue offering M + C benefits. But St. Joseph was concerned about its ability to continue to offer benefits during January and February 2001 and sought to assure that its members would not be without a plan for those two months while it prepared and submitted its rates and benefits for HCFA approval for the period of March through December 2001. So, on December 21, 2000, St. Joseph sought direction from HCFA on how St. Joseph could provide that January–February 2001 seamless coverage.

## C. Background of Misrepresentation/Breach of Contract Issues

{9} In response to St. Joseph's contact, on December 22, 2000, HCFA sent a letter to St. Joseph outlining six requirements that St. Joseph had to meet to retain coverage for its members during January and February 2001. Two of the requirements were (1) the re-enrollment of all of its members for the January–February period, and (2) the submission of separate "ACR" proposals to HCFA outlining rates and benefits for the January–February 2001 period and also for the March–December 2001 period. ACRs were documents, usually submitted annually, outlining proposed rates and benefits for specific periods, with actuarial and historical support. As indicated in this opinion, St. Joseph was required to submit new ACRs because M + C organizations that had not renewed their HCFA contracts had not submitted proposed rate and benefit changes to HCFA, which normally would have happened in July 2000 for the 2001 calendar year.

{10} Also on December 22, 2000, HCFA faxed to St. Joseph a letter for St. Joseph to send to its members along with an abbreviated member enrollment form also prepared by HCFA. After St. Joseph received and reviewed the letter, but before St. Joseph sent the letter to its members, St. Joseph and HCFA personnel spoke on the telephone. Out of concern about language in HCFA's letter, a St. Joseph representative proposed a change in the letter to indicate that current plan rates and benefits may change after March 1 because of the new March–December 2001 ACRs that HCFA was requiring. St. Joseph's concern was that the letter, drafted by HCFA, would create confusion among recipients, including the possibility that the letter could be read as representing that current (2000 through February 2001) plan rates or benefits would remain the same throughout 2001. St. Joseph knew at the time that it planned to substantially change the benefit plans offered to members beginning March 2001.

{11} In the December 22, 2000, telephone call, St. Joseph proposed specific changes to the letter to remove the possibility of confusion, including a statement that rates and benefits would continue to be the same in January and February 2001 only. But HCFA did not allow St. Joseph to change the letter as proposed. HCFA stated that it would not allow mention of the potential change in benefits because no such change had yet been approved by HCFA. HCFA approved St. Joseph's ACRs for January and February 2001, which continued the rates and benefits as they were in 2000. St. Joseph then sent the letter to its members on December 26, 2000, in the form required by HCFA. In bold print, the letter informed the members that St. Joseph "will continue to offer St. Joseph MedicarePlus to people with Medicare ... effective January 1, 2001 through December 31, 2001," and that "[t]he benefits, premium and copayment amounts will remain the same as they have been in 2000." Again, in bold print, the letter told the members to complete and sign an enrollment form if they wanted "to continue to receive [their] benefits and health care from St. Joseph MedicarePlus beginning January 1, 2001."

{12} HCFA denied a St. Joseph's December 29, 2000, request that a follow-up clarification be sent to the members. St. Joseph did, however, respond to questions from current and potential members by stating that there would be rate changes but that no more specific information would be available until HCFA made a decision on the issue. At a later time, HCFA approved new ACRs for March through December 2001, together with related marketing materials.

## D. Specific Benefit Change Giving Rise to Claims

{13} During 2000, St. Joseph operated three plans: the "Turquoise plan," which had no monthly premium and no prescription drug coverage; the "Silver plan," which had no monthly premium and covered a specified amount of prescription drugs; and the "Gold plan," which had a premium of $25 per month and covered a greater amount of prescription drugs. As of the end of 2000, St. Joseph knew that 60 percent of its members were enrolled in the Silver plan and 38–39 percent of its members were enrolled in the Gold plan. In February 2001, St. Joseph

sent a mailing to its members announcing reductions in plan benefits that would become effective March 1, 2001, including the elimination of the Silver plan; more than doubling the monthly premium for the Gold plan; and reductions in the benefits covered, including larger co-payments, for the Gold and Turquoise plans.

{14} Plaintiffs point out that, although the St. Joseph representative discussed her concerns about statements in the draft letter with HCFA personnel, the representative did not inform HCFA of St. Joseph's plan to eliminate the Silver plan on March 1, 2001. The Silver plan was the plan that had been selected by the majority of St. Joseph's members. It is the rate and benefits changes for March–December 2001 that gave rise to Plaintiffs' action.

### E. Plaintiffs' Claims

{15} In their class action against Defendants, Plaintiffs alleged that St. Joseph's December 26, 2000, letter disseminated knowingly false and misleading statements and representations to thousands of elderly and disabled beneficiaries regarding 2001 rates and benefits in order to induce them to enroll, and that the recipients relied on the statements and misrepresentations to enroll but then saw their benefits unilaterally reduced by St. Joseph effective March 1, 2001. Plaintiffs' complaint alleges that Plaintiffs and thousands of similarly situated persons enrolled based on St. Joseph's representations and offers, and paid amounts for coverage that, in the aggregate, equaled several million dollars. Plaintiffs claimed deceptive practices in violation of the Unfair Practices Act, NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 1999), breach of contract, and unjust enrichment. We refer to the underlying statutory and common law bases for Plaintiffs' claims as "state law claims." Plaintiffs sought damages, specific performance, restitution, and declaratory and injunctive relief. The district court ordered that the action be maintained as a class action. Plaintiffs state, and St. Joseph acknowledges, that if Plaintiffs' state law claims are preempted, Plaintiffs have no remedy under state or federal law.

{16} Presumably based on the foregoing facts, the district court entered summary judgment holding that Plaintiffs' state law claims were preempted, and stating:

THE COURT FINDS that the claims of Plaintiffs and the class are expressly preempted by 42 U.S.C. § 139[5]w–26(b)(3)(B), which was effective December 21, 2000, and that the claims also are preempted under the doctrine of conflict preemption, because compliance with both state law and the directions of the [HCFA] would have been impossible under the circumstances.

## DISCUSSION

### A. Standard of Review

 {17} When we review summary judgments as though the material facts are undisputed, we do so de novo. *Barncastle,* 2000–NMCA–095, ¶ 5, 129 N.M. 672, 11 P.3d 1234. "Whether Defendants were entitled to judgment as a matter of law based on federal preemption is a legal question we review de novo." *Largo v. Atchison, Topeka & Santa Fe Ry.,* 2002–NMCA–021, ¶ 5, 131 N.M. 621, 41 P.3d 347. We interpret the intention of Congress and the meaning of its statutes de novo. *See Hennessy v. Duryea,* 1998–NMCA–036, ¶¶ 6–7, 124 N.M. 754, 955 P.2d 683.

### B. Medicare Preemption Law

{18} Medicare statutes and regulations governing M + C programs involve substantial regulation and supervision of M + C organizations. *See* §§ 1395w–21, –26; 42 C.F.R. pt. 422. Our focus is on the M + C program preemption provisions contained in BIPA.

{19} Before BIPA was enacted in 2000, the M + C preemption provision in § 1395w–26(b)(3) (1997) read:

(A) In general

The standards established under this subsection shall supersede any State law or regulation (including standards described in subparagraph (B)) with respect to Medicare + Choice plans which are offered by Medicare + Choice organizations under this part to the extent such law or

regulation is inconsistent with such standards.

(B) Standards specifically superseded

State standards relating to the following are superseded under this paragraph:

(i) Benefit requirements[.]

The federal "standards" referred to in Subsection (A) of § 1395w–26(b)(3) mean federal regulations adopted by the United States Department of Health and Human Services. *See* § 1395w–26(a), (b). Pursuant to this former version of the statute, the Secretary of Health and Human Services in 1998, *see* 63 F.R. 35098, promulgated the following preemption regulation:

(a) General preemption. Except as provided in paragraph (b) of this section, the rules, contract requirements, and standards established under this part supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to M + C organizations and their M + C plans only to the extent that such State laws are inconsistent with the standards established under this part. This preemption of State laws and other standards applies only to coverage pursuant to an M + C contract, and does not extend to benefits outside of such contract or to individuals who are not M + C enrollees of an organization with an M + C contract.

(b) Specific preemption. As they might otherwise apply to the M + C plans of an M + C organization in a State, State laws and regulations pertaining to the following areas are specifically preempted by this part:

(1) Benefit requirements, such as mandating the inclusion in an M + C plan of a particular service.... State cost-sharing standards with respect to any benefits are preempted only if they are inconsistent with this part, as provided for in paragraph (a) of this section.

42 C.F.R. § 422.402(a), (b) (1998).

{20} In BIPA, Congress amended Subsection (B) (Standards specifically superseded) of § 1395w–26(b)(3) and broadened its preemption coverage. It is the broadened preemption coverage in BIPA that is at issue in this appeal. Section 614 of BIPA, entitled "AVOIDING DUPLICATIVE REGULATION," amended Subsection (B) of § 1395w–26(b)(3) by adding the following italicized words:

(B) Standards specifically superseded

State standards relating to the following are superseded under this paragraph:

(i) Benefit requirements *(including cost-sharing requirements).*

. . . .

*(iv) Requirements relating to marketing materials and summaries and schedules of benefits regarding a Medicare + Choice plan.*

BIPA, § 614(a)(1), (2); § 1395w–26(b)(3)(B) (2000) (emphasis added). We refer to these BIPA italicized preemption amendments as "the BIPA amendments." The BIPA amendments became effective upon the December 21, 2000, date of enactment of BIPA. *See* BIPA, § 614(b). It is paragraph (iv) of Subsection (B) that contains the preemption language pertinent to this appeal, since the December 26, 2000, letter constituted "marketing materials."

{21} The federal "standards" referred to in Subsection (A) of § 1395w–26(b)(3) include guidelines for review of marketing material by HCFA. *See* § 1395w–21(h)(2). "Marketing materials" under the Medicare + Choice regulations

include any informational materials targeted to Medicare beneficiaries which:

(1) Promote the M + C organization, or any M + C plan offered by the M + C organization;

(2) Inform Medicare beneficiaries that they may enroll, or remain enrolled in, an M + C plan offered by the M + C organization;

(3) Explain the benefits of enrollment in an M + C plan, or rules that apply to enrollees;

(4) Explain how Medicare services are covered under an M + C plan, including conditions that apply to such coverage[.]

42 C.F.R. § 422.80(b) (2002). Examples of marketing materials include "[l]etters to members about contractual changes; changes in providers, premiums, benefits,

plan procedures etc." 42 C.F.R. § 422.80(b)(5)(vi). It is undisputed that St. Joseph's December 26, 2000, letter to its members constituted "marketing materials" as contemplated under 42 C.F.R. § 422.80.

{22} The Secretary has not amended its preemption regulation contained in 42 C.F.R. § 422.402(a) and (b) to conform to the BIPA amendments. However, in February 2001 HCFA sent a letter to state insurance commissioners stating that, as a result of the BIPA amendments, M + C organizations

> are no longer required to follow State regulations relating to co-pays, deductibles and coinsurance that apply to benefits under a Medicare + Choice plan (whether original Medicare benefits or additional or supplemental benefits offered under the plan). In addition, [BIPA § 614] specifically prohibits States from imposing requirements related to the content or review of marketing materials. . . .

> The changes described above became effective with BIPA's enactment, and apply to marketing materials submitted after December 21, 2000, including those submitted to HCFA for review under BIPA.

{23} BIPA did not change existing Medicare law and regulation requiring organizations such as St. Joseph to comply with state consumer protection laws and quality standards, so long as such laws and standards were not otherwise preempted under § 1395w–26(b)(3)(B):

> A waiver granted under this paragraph to an organization with respect to licensing under State law is conditioned upon the organization's compliance with all consumer protection and quality standards insofar as such standards—
>
> (I) would apply in the State to the organization if it were licensed under State law;
>
> (II) are generally applicable to other Medicare + Choice organizations and plans in the State; and
>
> (III) are consistent with the standards established under this part.

§ 1395w–25(a)(2)(G)(i). The accompanying regulation, 42 C.F.R. § 422.378 (1998), reads:

> (a) Preemption of State law. Any provisions of State law that relate to the licensing of the organization and that prohibit the organization from providing coverage under a contract as specified in this subpart, are superseded.
>
> (b) Consumer protection and quality standards.
>
> (1) A waiver of State licensure granted under this subpart is conditioned upon the organizations's compliance with all State consumer protection and quality standards that—
>
> (i) Would apply to the organization if it were licensed under State law;
>
> (ii) Generally apply to other M + C organizations and plans in the State; and
>
> (iii) Are consistent with the standards established under this part.

While these PSO-related provisions caution against application of standards preempted under § 1395w–26(b)(3)(B), the provisions are relevant on the issue of legislative intent since they specifically refer to state consumer protection law and remained unchanged through the BIPA amendments.

## C. General vs. Specific Preemption Provisions

{24} One court has described how Subsections (A) and (B) under § 1395w–26(b)(3) apply. According to the First Circuit Court of Appeals, § 1395w–26(b)(3), "subparagraph (A) provides a general rule of conflict preemption that (as the parenthetical and title, ["In general"], make clear) applies universally—that is, *all* state standards are preempted to the extent they are inconsistent with federal regulations." *Ruthardt*, 194 F.3d at 183. Subsection (B), on the other hand, narrows the preemption by making state standards concerning the specifically enumerated areas "per se inconsistent with *any* federal regulation." *Id.* According to *Ruthardt*, "Subparagraph (B) thus makes explicit what might well have been implied: the anticipation that, once promulgated, federal regulations will dominate these particular fields, leaving no room therein for state standard-setting." *Id.* Therefore, pursuant to the *Ruthardt* Court's analysis, once the Secretary established regulations, such as those in 42

C.F.R. pt. 422, no state standard relating to the enumerated area can be viable. *Id.*

{25} Subsection (B) defines the preemptive reach of BIPA to specifically include marketing materials. Yet, while "marketing materials" were described in a regulation predating the BIPA amendments, *see* 42 C.F.R. § 422.80(b), no regulation specifically relating to Subsection (B) was adopted following the BIPA amendments. Nevertheless, due to the specificity of Subsection (B)'s preemption language, the absence of a related, more specifically interpretive regulation, does not relieve us of the responsibility to interpret Subsection (B)'s intended scope. Thus, our task at the outset is to determine from the words of Subsection (B), within the context of BIPA and with a presumption about the nature of preemption, whether Congress intended the preemptive scope and reach of Subsection (B) to include the state laws that gave rise to Plaintiffs' state law claims. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 484–85, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). That inquiry centers on whether the state law claims are within the expressly preempted domain of Subsection (B). *See id.* at 484, 116 S.Ct. 2240; *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). This requires us to first turn our attention to the breadth of the words "relating to" in § 1395w–26(b)(3)(B). We then consider the meaning and application of the operative word "requirements" in regard to preempted state action.

### 1. The Reach of "Relating To"

{26} Subsection (B) uses the words "relating to" in two significant places. Paraphrasing parts of Subsection (B) together, it states that Congress intended state standards *relating* to requirements *relating to* marketing materials to be superseded. The United States Supreme Court has construed the words "relating to" appearing in an express preemption provision to have a broad preemptive purpose. In *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Texas attorney general sued certain airlines to enjoin what the attorney general alleged were violations of the state's deceptive trade practices

laws applicable to advertising. *Id.* at 379–80, 112 S.Ct. 2031. The Court stated: "The ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' Black's Law Dictionary 1158 (5th ed.1979)—and the words thus express a broad pre-emptive purpose." *Id.* at 383, 112 S.Ct. 2031.

{27} The *Morales* Court construed a provision of the Airline Deregulation Act of 1978(ADA), which "expressly pre-empt[ed] the States from 'enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the force and effect of law *relating to* rates, routes, or services of any air carrier.'" *Id.* (quoting § 1305(a)(1) of the ADA) (emphasis added). Drawing on its application of the words "relates to" in ERISA preemption, the Court noted that in *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), it "held that a state law 'relates to' an employee benefit plan, and is pre-empted by ERISA, 'if it has a connection with, or reference to, such a plan.'" *Morales,* 504 U.S. at 384, 112 S.Ct. 2031. The Court rejected the attorney general's contention that only state laws specifically addressed to the airline industry were preempted and that the ADA imposed no constraints on laws of general applicability, such as the Texas deceptive trade practices law. *Id.* at 386, 112 S.Ct. 2031. The Court noted that it had "rejected this precise argument in our ERISA cases: [A] state law may relate to a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Id.* (internal quotation marks and citation omitted) (alteration in original). The Court saw the argument of the attorney general as "creating an utterly irrational loophole," stating there is "little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute." *Id.* The Court in *Morales* held the ADA preemption provision applicable and controlling. *Id.* at 391, 112 S.Ct. 2031; *see also Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47–48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding common law tort

and contract action by ERISA plan participant asserting improper processing of benefits by insurer to be preempted under ERISA where claims "relate[d] to" an employee benefit plan).

{28} Nevertheless, the words "relating to" are also subject to a narrow construction, if a narrow construction is what Congress intended. *See Cipollone,* 505 U.S. at 529, 112 S.Ct. 2608 (construing the words "relating to smoking and health" in Section 5(b) of the Federal Cigarette Labeling and Advertising Act of 1965 narrowly, in concluding that the phrase "[did] not encompass the more general duty not to make fraudulent statements"); *see also Morales,* 504 U.S. at 419–20, 112 S.Ct. 2031 (Stevens, J., dissenting) (disfavoring reliance on, and broad construction of, the words "relating to" without considering the words in the context of "the language, structure, and history of the ADA"). HCFA in fact has expressed the view that, "under principles of Federalism, and Executive Order 13132 on Federalism," HCFA is required to construe preemption narrowly when state tort and contract remedies aimed at consumer protection are at issue. 65 F.R. 40170, 40261, HCFA response to comment on Final Rule relating to 42 C.F.R. pts. 417 and 422 (June 29, 2000).

{29} Furthermore, the cases in which "relating to" has been broadly construed, the victim of alleged wrongdoing appears to have had a federal remedy. *See, e.g., Dedeaux,* 481 U.S. at 54–56, 107 S.Ct. 1549 (holding state common law tort and breach of contract claims for failure to pay benefits under an insurance policy were preempted under ERISA, and pointing out that ERISA's "comprehensive civil enforcement scheme" was intended by Congress to provide exclusive remedies for an ERISA plan participant's claims, and viewing ERISA's preemptive force to be comparable to § 301 of the Labor–Management Relations Act of 1947, after which the preemptive force of ERISA was modeled).

**2. The Reach of State "Requirements"**

{30} The operative words found in Subsections (A) and (B) in regard to state action are

the following shown in italics, respectively: "supersede any State *law* or *regulation* (including *standards* described in subparagraph (B))"; and "State *standards* relating to . . . *[r]equirements* relating to marketing materials." § 1395w–26(b)(3)(A), (B) (emphasis added).

{31} Section 422.402(a) reads slightly different than § 1395w–26(b)(3)(A). It says "supersede any State *laws, regulations, contract requirements,* or other *standards.*" (Emphasis added.) Section 422.402(b) also reads slightly different than § 1395w–26(b)(3)(B), stating "State *laws* and *regulations* pertaining to . . . *[b]enefit requirements,* . . . State *cost-sharing standards.*" (Emphasis added.) The HCFA February 2001 letter to state insurance commissioners stated: M+C organizations "are no longer required to follow [certain] State *regulations.* . . . In addition, [the statute] specifically prohibits States from imposing *requirements* related to the content or review of marketing materials." (Emphasis added.)

{32} Reading the wording of the statute, regulation, and letter together, we conclude that the operative word for determining whether general state deceptive trade practices and common law are preempted by or conflict with federal law is "requirements." In this case we must determine whether Plaintiffs' state law claims were intended by Congress to constitute "*requirements* relating to marketing materials."

**D. Preemption Analysis**

{33} It is readily apparent that a rush was on to try to maintain coverage without harm to either the process or the participants. During the rush, St. Joseph became concerned about the statements in the December 26, 2000, letter, since St. Joseph intended to significantly change rates and benefits for the period March–December 2001. HCFA appears to have been concerned about making representations about the March–December 2001 benefits before approval of those benefits was given by HCFA. HCFA prepared a letter to St. Joseph's members that HCFA required in order to facilitate a result sought in the midst of the rush, and presumably without wanting to first take the time

normally necessary to consider and approve the change in benefits St. Joseph planned to make in March 2001. The primary result St. Joseph sought and obtained was HCFA-approved coverage from 2000 through February 2001 at the same rates and with the same benefits, so that St. Joseph could provide January–February 2001 coverage for its members. However, an accompanying result was a statement in the letter clearly indicating that the March–December 2001 coverage rates and benefits would not change. No state law or regulation relating specifically to health care rates, benefits, or marketing materials containing such information, is in conflict with this agency and regulated entity action. But the action comes within the scope of general state consumer protection deceptive trade practices legislation and general common law duties.

{34} This appeal involves issues of both express and implied federal preemption. "Pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Shaw*, 463 U.S. at 95, 103 S.Ct. 2890 (internal quotation marks and citation omitted). The first issue here is whether the BIPA amendments, and more specifically § 1395w–26(b)(3)(B), expressly preempt Plaintiffs' state law claims. *See Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608. "Express preemption occurs when Congress has unmistakably ... ordained that its enactments alone are to regulate a [subject, and] state laws regulating that [subject] must fall." *Ruthardt*, 194 F.3d at 179 (internal quotation marks and citation omitted) (alteration in original); *Southwestern Bell Wireless Inc. v. Johnson County Bd. of County Comm'rs*, 199 F.3d 1185, 1190 (10th Cir.1999) ("To find express preemption, Congress must have explicitly stated by statute its intent to preempt state and local regulation of [the] issues.").

{35} The second issue, is one of implied preemption, and more specifically, conflict preemption, requiring a determination whether compliance with both state and federal law is impossible or whether state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of federal law. *See, e.g., Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608; *Ruthardt*, 194 F.3d at 179.

{36} Legal duties that are imposed under state consumer protection statutes and by general common law duties can fall within the scope of the broad terms "law" and "standard," when those terms become part of a preemption analysis. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 673–74, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (holding that Federal Railroad Safety Act regulations did not preempt common law negligence claim for failure to maintain railroad crossing warning devices, but that regulatory speed limits preempted claim that conductor was proceeding too fast under the circumstances); *Cipollone*, 505 U.S. at 522, 112 S.Ct. 2608 (stating that "common-law damages actions ... are premised on the existence of a legal duty, and ... do not impose 'requirements or prohibitions' ").

{37} Needless to say, BIPA and its related regulations and HCFA's letter to the state insurance commissioners present a formidable basis on which to consider the invocation of preemption with respect to the general state consumer protection statutes and general common law duties under which Plaintiffs sue. On the surface, it was not unreasonable for the district court to hold that the state claims were preempted. However, a deeper analysis of the law and of likely congressional intent requires, we think, a different result.

### 1. General Principles

{38} Because states are independent sovereigns in our federal system, the United States Supreme Court has "long presumed that Congress does not cavalierly preempt state-law causes of action." *Medtronic, Inc.*, 518 U.S. at 485, 116 S.Ct. 2240. "In the interest of avoiding unintended encroachment on the authority of the States ... a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is the clear and manifest purpose of Congress." *CSX Transp., Inc.*, 507 U.S. at 663–

64, 113 S.Ct. 1732 (internal quotation marks and citation omitted). There exists a presumption against preemption. *Id.* at 668, 113 S.Ct. 1732. The scope of a statute's preemption is guided by a court's understanding of the purpose of Congress in enacting the preemption. *Medtronic, Inc.*, 518 U.S. at 485–86, 116 S.Ct. 2240. In reaching that understanding, we must keep in mind that it would be "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Id.* at 487, 116 S.Ct. 2240 (internal quotation marks and citation omitted). Courts are permitted to question particular word usage when a word in the statute is necessarily relied on to reach a preemption result under contention. *See id.* at 488–89, 116 S.Ct. 2240 (determining a party's interpretation of the word "requirement" in the preemption statute to be too "sweeping," in that it "would require far greater interference with state legal remedies, producing a serious intrusion into state sovereignty while simultaneously wiping out the possibility of remedy for . . . alleged injuries").

■ {39} This Court, too, has stated that "[t]here is a strong presumption against preemption." *Montoya v. Mentor Corp.*, 1996–NMCA–067, ¶ 7, 122 N.M. 2, 919 P.2d 410. Further, we adhere to the rule that the party claiming preemption must show a clear and manifest intent of Congress to preempt. *Id.* ¶ 8, 919 P.2d 410. We have expressed our "reluctance to preempt state laws relating to health and safety matters because those matters have been the exclusive concern of the states." *Id.* ¶ 7, 919 P.2d 410. "There is also a presumption against preemption if it would deny an injured party all judicial remedies, especially in the face of congressional silence." *Id.* With these general principles in mind, we turn next to the federal cases that are more informative on the issues.

### 2. Analysis of Instructive Cases

{40} In *Medtronic, Inc.*, the Food and Drug Administration (FDA) was required, under the Federal Food, Drug and Cosmetic Act, as amended by the Medical Device Amendments of 1976 (MDA), to assess whether the pacemaker was " 'substantially equivalent' to devices already on the market," and it did so and permitted the pacemaker to be marketed. 518 U.S. at 480, 116 S.Ct. 2240. A recipient of a pacemaker sued its manufacturer seeking damages in negligence and strict liability. *Id.* at 481, 116 S.Ct. 2240. The MDA's preemption clause stated that "no State . . . may establish . . . with respect to a device intended for human use any *requirement*—. . . which *relates to* the safety or effectiveness of the device or to any other matter included in a *requirement* applicable to the device under this chapter." *Id.* at 481–82, 116 S.Ct. 2240 (quoting 21 U.S.C. § 360k(a)(2)) (emphasis added). In analyzing the scope of this preemption language, the United States Supreme Court first reiterated its longstanding presumption that "Congress does not cavalierly pre-empt state-law causes of action." *Id.* at 485, 116 S.Ct. 2240. The Court then analyzed Congress' purpose behind the MDA. *Id.* at 485–89, 116 S.Ct. 2240. The Court stated:

> [I]f Congress intended to preclude all common-law causes of action, it chose a singularly odd word with which to do it. The statute would have achieved an identical result, for instance, if it had precluded any "remedy" under state law relating to medical devices. "Requirement" appears to presume that the State is imposing a specific duty upon the manufacturer, and although we have on prior occasions concluded that a statute pre-empting certain state "requirements" could also pre-empt common-law damages claims, that statute did not sweep nearly as broadly as Medtronic would have us believe that this statute does.

*Id.* at 487–88, 116 S.Ct. 2240 (citation omitted). The Court rejected as unpersuasive and implausible Medtronic's argument that "Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device." *Id.* at 487, 116 S.Ct. 2240. Expanding on this, the Court stated:

> Medtronic's construction of [the preemption provision] would therefore have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Con-

gress, needed more stringent regulation in order "to provide for the safety and effectiveness of medical devices intended for human use[.]" It is, to say the least, "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct[.]"

*Id.* (citations omitted). More specifically, the Court determined that even "giving the term 'requirement' its widest reasonable meaning did not have nearly the pre-emptive scope nor the effect on potential remedies that Medtronic's broad reading of the term would have." *Id.* at 488, 116 S.Ct. 2240. The Court felt that "Medtronic's sweeping interpretation of the statute would require far greater interference with state legal remedies, producing a serious intrusion into state sovereignty while simultaneously wiping out the possibility of remedy for the … injuries." *Id.* at 488–89, 116 S.Ct. 2240.

{41} The *Medtronic, Inc.* Court also determined that Congress "was primarily concerned with the problem of specific, conflicting state statutes and regulations rather than the general duties enforced by common-law actions." *Id.* at 489, 116 S.Ct. 2240. The Court further determined that "legislative history indicate[d] that any fears regarding regulatory burdens were related more to the risk of *additional* federal and state regulation rather than the danger of pre-existing duties under common law." *Id.* at 490, 116 S.Ct. 2240. The Court rejected the argument that "by using the term 'requirement,' Congress clearly signaled its intent to deprive States of any role in protecting consumers from the dangers inherent in many medical devices." *Id.* at 489, 116 S.Ct. 2240. Based on these considerations, and others, the Court held that the MDA's preemption provision did not preclude the common law damage claims. *Id.* at 503, 116 S.Ct. 2240.

{42} In *Cipollone*, a smoker and her spouse sued cigarette manufacturers on various common law theories. 505 U.S. at 509, 112 S.Ct. 2608. The smoker developed lung cancer from which she ultimately died. *Id.* The preemption provision in the 1965 version of the Federal Cigarette Labeling and Advertising Act provided that, "[n]o statement *relating to* smoking and health" was required to be placed in advertising or on cigarette packages except as required by or in conformity with the Act. *Id.* at 514, 112 S.Ct. 2608 (emphasis added). The preemption provision in the 1969 version of the same Act stated that, "[n]o *requirement or prohibition* based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Id.* at 515, 112 S.Ct. 2608 (emphasis added).

{43} The Third Circuit Court of Appeals, because of what it considered the potential regulatory effect of the common law actions on the federal interest of uniformity, concluded that "Congress had impliedly pre-empted [the] claims challenging the adequacy of the warnings on labels or in advertising or the propriety of [the] advertising and promotional activities." *Id.* at 517, 112 S.Ct. 2608. The Supreme Court disagreed. The Court analyzed the "domain expressly pre-empted by [the two preemption] sections." *Id.* It held that the preemption clause in the 1965 Act "only pre-empted state … rulemaking bodies from mandating particular cautionary statements and did not pre-empt state-law damages actions." *Id.* at 519–20, 112 S.Ct. 2608. With regard to the 1969 Act, the Court rejected Cipollone's assertion that "the phrase 'requirement or prohibition' limits the 1969 Act's pre-emptive scope to positive enactments by legislatures and agencies." *Id.* at 522, 112 S.Ct. 2608. Giving the clause with this phrase "a fair but narrow reading," *id.* at 524, 112 S.Ct. 2608 the Court held that "the 1969 Act pre-empte[d] [the] claims based on a failure to warn and the neutralization of federally mandated warnings to the extent that those claims rel[ied] on omissions or inclusions in [the] advertising or promotions," but that *"the 1969 Act [did] not pre-empt [the] claims based on express warranty, intentional fraud and misrepresentation, or conspiracy."* *Id.* at 530–31, 112 S.Ct. 2608 (emphasis added). As to the claims not preempted, the Court reasoned that those claims were "predicated not on a duty 'based on smoking and health' but rather on a more general obligation[,] the duty not to deceive." *Id.* at 528–29, 112 S.Ct. 2608. The Court

expressed that "Congress intended the phrase 'relating to smoking and health' . . . [in the 1965 Act] to be construed narrowly, so as not to proscribe the regulation of deceptive advertising." *Id.* at 529, 112 S.Ct. 2608.

{44} In *Ruthardt,* the First Circuit Court of Appeals held that federal law preempted a law passed by the Massachusetts legislature requiring supplemental Medicare providers to offer at least one plan that included unlimited outpatient prescription drug coverage. *Id.* at 177, 183, 185. An association of HMOs sued the state commissioner of insurance to prohibit enforcement of the legislation on the ground that the legislation was preempted by the preemption provision in the BBA, § 1395w–26(b)(3)(B), as it existed before the BIPA amendments. *Ruthardt,* 194 F.3d at 178. The commissioner did not dispute that the state law was a "state standard[ ] . . . relat[ing] to benefit requirements." *Id.* at 180. The court determined that the three specifically enumerated areas in Subsection (B) were "not expressly preempted unless and until the Secretary triggers preemption by promulgating regulations." *Id.* at 183. Noting that the Secretary had promulgated regulations, the Court determined that, at the point those regulations were promulgated, "the Commonwealth's requirement that supplemental health care providers must offer full prescription drug coverage became ineffectual." *Id.* The Court concluded its opinion by stating "Congress's intent to prefer an exclusively federal regulatory scheme and to preempt all state benefit requirements is clear and manifest, even if not immediately apparent." *Id.* at 185.

{45} *McCall* is also informative. The California Supreme Court held that state law damage claims against an HMO, arising out of the HMO's refusal to provide services under a Medicare-subsidized health plan, did not fall within the exclusive review provisions of the Medicare law requiring exhaustion of administrative remedies. 21 P.3d at 1193–94, 1200. The claims were for damages based on negligence, intentional and negligent infliction of emotional distress, unfair business practices, and fraud in connection with treatment of progressive lung disease. *Id.* at

1192. The issue was whether the plaintiff alleged a claim "arising under" the Medicare Act, and therefore involved construction of the words "arising under" in connection with whether the plaintiff was required to exhaust federal administrative remedies. *Id.* at 1193–94; 42 C.F.R. § 405(g), (h) (providing that a final decision of the Secretary on a claim "arising under" Medicare can be reviewed only in an action brought in federal district court, and then only after exhausting administrative remedies). Also, it appears the injury occurred before the passage of the BBA and its M + C provisions. *McCall,* 106 Cal.Rptr.2d 271, 21 P.3d at 1197–98. The Court partially drew upon the BBA provisions to support the presumption that Congress did not intend to preempt state regulation of the same subject matter unless a contrary intent was made clear (citing *Medtronic, Inc.* and *Cipollone* ), and also to support the Court's view that "[n]o intent to displace state tort law remedies was expressed in the Medicare Act as it read at the time relevant to this case." *Id.* at 1197.

{46} In our view, the United States Supreme Court signaled in *Medtronic, Inc.* and *Cipollone* a move toward favoring state court access to assert violations of state consumer based and general common law duties and obtain commensurate remedies in the health arena when consumers have been harmed. *McCall* is instructive as a state court case analyzing the BBA and indicating that Congress did not intend state common law remedies to be preempted. *Ruthardt* is somewhat informative because it decides preemption under § 1395w–26(b)(3)(B), the provision specifically at issue in the present case. However, *Ruthardt* is not particularly instructive, since the preempted state requirement consisted of state legislation that specifically related to the subject of the specific preemption, not a legal action by citizens seeking remedies through state general consumer protection law and common law theories of recovery.

3. **The State Law Claims Are Not Preempted Under § 1395w–26(b)(3)(B) or Under Conflict Preemption**

{47} When we evaluate the presumption against preemption along with *Medtronic,*

*Inc.* and *Cipollone* in the context of this case, we are struck by several factors which, taken together, lead us to conclude that the state law claims alleged by Plaintiffs are not preempted under either express preemption or conflict preemption. The several factors set themselves apart from what might otherwise appear to be controlling statutory and regulatory provisions.

{48} First, the claims and remedies for injury under state general theories of recovery such as deceptive trade practices, breach of contract, and unjust enrichment, are not in any sense positive law prohibitions or regulations relating specifically to any particular industry, much less specifically to the manner in which M + C marketing materials are to be presented to members. Furthermore, we read the words "relating to" and "requirements" narrowly, under the strong presumption-against preemption guideline, *see Montoya,* 1996–NMCA–067, ¶ 7, 122 N.M. 2, 919 P.2d 410, in accordance with HCFA's own view regarding construction of statutory provisions, and in view of the fact that Plaintiffs have no remedy if preemption is invoked to exclude consumer claims such as those in the present case. In particular, Congress' use of the term "requirement" in § 1395w–26(b)(3)(B)(iv) does not signal an intent to establish preemptive interference with state general deceptive trade practices and contract remedies such as those sought in the present case, especially if the words are construed narrowly, as we think they should be in these circumstances. *See Medtronic, Inc.,* 518 U.S. at 487–89, 116 S.Ct. 2240; *Cipollone,* 505 U.S. at 524, 112 S.Ct. 2608. Under narrow constructions of those words, we do not view the general theories of recovery to have specific enough focus on Medicare-related marketing materials to constitute "requirements relating to marketing material."

{49} Second, Congress certainly was aware of the existence and purpose of state general deceptive trade practices and breach of contract claims and remedies to protect citizens from harm. Congress was no doubt aware of an issue whether state general consumer protection statutes and common law duties should be preempted. However, no-

where in the M + C-related legislation did Congress use language that specifically indicated that such claims were to be precluded, particularly when the remedy sought is for damages for misrepresentation on contract breach by regulated private entities. Nor has the Secretary adopted regulations using more specific language.

{50} Third, Plaintiffs' state law claims are not based on state standards that directly diminish, limit, or circumscribe the lawful authority or duties given to HCFA under federal law or regulation. While the effect of successful assertion of the state law claims against regulated entities may indirectly affect HCFA's discretionary authority, we think such effect is an inadequate reason to invoke either express or conflict preemption when the discretionary authority produces a knowing regulated entity misrepresentation, whether that result occurred with HCFA knowledge or through the regulated entity's failure to adequately inform HCFA of material facts.

{51} Finally, if Plaintiffs' claims are dismissed because they are preempted, Plaintiffs have no remedy. We agree with the view of the United States Supreme Court that Congress does not intend to cavalierly preempt state law causes of action, and that it would be "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Medtronic, Inc.,* 518 U.S. at 487, 116 S.Ct. 2240 (internal quotation marks and citation omitted).

{52} It appears that St. Joseph adequately informed HCFA of St. Joseph's concern that the statement in the letter that all benefits would cover the entire year was untrue and that St. Joseph planned to seek a change in benefits for March through December. We understand the difficult position in which HCFA placed St. Joseph. St. Joseph obviously thought itself between the proverbial "rock and hard spot." From St. Joseph's point of view, HCFA, ruling the roost, would not hear of St. Joseph's concern regarding the treatment of its members.

{53} We are nevertheless unable to accept the position that St. Joseph advances, namely, that preemption must be applied because

the entire process of sending the marketing materials was controlled by HCFA; that if benefits for January and February were not provided, St. Joseph's "parent company more than likely would not have let [St. Joseph] come back in at all"; that its members wanted to stay with St. Joseph; that St. Joseph should not be responsible if HCFA knowingly and intentionally caused and required St. Joseph to misrepresent material facts in representing and offering the plans to senior citizen members; and that under preemption law, the victims have no recourse in court against either the federal agency or the provider. Despite the dilemma in which St. Joseph thought itself, Congress could not have intended to grant a federal agency the prerogative St. Joseph advances, with a commensurate immunity granted to a regulated private entity that feels compelled to participate in wrongful conduct, where no remedy is provided or allowed for damages resulting from such wrongdoing. Congress could not have intended to grant such carte blanche to HCFA and its regulated private providers.

{54} We determine that compliance with both state and federal law is not an impossibility, and that the state law claims do not stand as an obstacle to the accomplishment of the full purposes and objectives of Medicare law and regulation. Moreover, our decision denying preemption in this case does not harm or significantly interfere with the operation of M + C programs or the authority of HCFA. HCFA continues to have the authority and discretion given it under statute and regulation. The apparent rush to fix a break in coverage that was of immediate concern, yet attempt to adhere to set marketing material approval procedures and requirements, presents us with what could simply be, and what one would hope is, an odd circumstance, one not likely to be repeated: the federal Medicare agency, with the responsibility of assuring that marketing materials of a regulated private provider are accurate, knowingly permitting, if not requiring, inaccurate material to be sent by the regulated private provider to senior citizen members. Thus, if HCFA does its job conscientiously and carefully, we see little concern about overall disruption of the federal scheme or of HCFA authority with preemption rejected in this case.

{55} If, in fact, HCFA is the primary wrongdoer in this case, we are not particularly comfortable with the fact that it is St. Joseph that must bear the brunt of Plaintiffs' claims instead of HCFA. The answer, however, is for Congress to fix the problem, and to be more clear and specific in its preemption language. We do not believe, in this instance, that the law of preemption denies harmed members all access to the court for relief when the members are damaged by knowing, intentional wrongdoing.

{56} We are aware of United States Supreme Court authority stating that "the relationship between a federal agency and the entity it regulates is inherently federal." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (holding that patients' state law, "fraud-on-the-FDA" claims were impliedly preempted). We agree with *Buckman's* view that "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Id.* (internal quotation marks and citation omitted). In the present case, however, the misrepresentation was made in the opposite direction, from regulating agency to consumers through the private regulated entity. It was not made by the regulated entity to the regulating agency. Here, we are concerned with the fox guarding the henhouse door—the federal agency purportedly protecting the consumer through the agency's regulatory authority, yet apparently using that authority improperly. General state consumer protection against deceptive trade practices and general state common law contract remedies exist precisely to compensate for such harmful conduct. Where, as here, the private regulated entity knowingly participates in the misrepresentation, it seems reasonable, and not contrary to congressional intent, that the preemption doctrine not preclude state law claims for relief against the private regulated entity.

{57} Our views comport with the concept of federalism, embraced by HCFA itself, that recognizes the historical and traditional role of states in protecting the health, welfare, and safety of their citizens, notwithstanding the federal government's "increasingly significant role in the protection of the health of

our people." *Medtronic, Inc.*, 518 U.S. at 475, 116 S.Ct. 2240; *see also* Exec. Order No. 13,132, 64 Fed.Reg. 43,255 (Aug. 4, 1999). We acknowledge the need for such a federal government role. The question is, should that role be one that precludes innocent victims from obtaining any remedy if they are harmed and if their state law claims are meritorious. We think not under the circumstances of this case.

## CONCLUSION

{58} Plaintiffs' claims are not preempted under federal Medicare law. We reverse.

{59} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Chief Judge, and A. JOSEPH ALARID, Judge.