2007-NMCA-100

166 P.3d 1091

**M.D. LOHMAN, Individually and on behalf of all similarly situated persons, Plaintiff–Appellee,**

v.

**DAIMLER–CHRYSLER CORPORATION, and United States Testing Company, Defendants–Appellants.**

No. 25,752.

Court of Appeals of New Mexico.

March 15, 2007.

Certiorari Denied, No. 30,334, May 2, 2007.

Certiorari Denied, No. 30,341, Aug. 1, 2007.

Law Offices of James P. Lyle, P.C., James P. Lyle, Albuquerque, NM, for Appellee.

Wallace King Domike & Branson, PLLC, Terri S. Reiskin, Washington, D.C., Rodey, Dickason, Sloan, Akin & Robb, P.A., Edward Ricco, Jocelyn Drennan, Jeffrey M. Croasdell, Albuquerque, NM, for Appellant Daimler–Chrysler Corporation.

Dines & Gross, P.C., Gregory P. Williams, Jim Dines, Albuquerque, NM, for Appellant United States Testing Company, Inc.

## OPINION

ORTIZ, Judge (sitting by designation of New Mexico Supreme Court).

{1} This is a putative class action relating to allegedly defective seat belt buckles. The first amended complaint alleged several causes of action, all of which were dismissed except a claim under the Unfair Practices Act (UPA). By their interlocutory' appeals. Defendants Daimler–Chrysler Corporation (DCC) and United States Testing Company (USTC) (collectively, Defendants) seek the dismissal of the remaining UPA claim. For the reasons that follow, we reject Defendant's various assertions of error and affirm.

## BACKGROUND

{2} The products at issue in this case are seat belts that were widely utilized by vehicle manufacturers in the 1980s and 1990s, known as the TK–52 series. Plaintiff asserts that

the TK–52 series buckles have a propensity to partially engage, such that the user may reasonably believe that the buckle is securely fastened when it is not. Federal Motor Vehicle Safety Standard number 209 (FMVSS 209) specifically requires testing and certification to prevent buckles which are subject to this sort of partial engagement from reaching the market. Plaintiff contends that Defendants were aware that the TK–52 series buckles did not comply with FMVSS 209. Plaintiff alleges that Defendants conspired to conceal this deficiency by adopting an internal policy purporting to exempt the buckles from partial engagement testing, by falsely certifying that the buckles comply with FMVSS 209, and by systematically denying that the buckles are defective. This is the alleged factual context out of which Plaintiff's claims arise.

{3} Defendants advance a two-pronged attack on the legal sufficiency of Plaintiff's first amended complaint. First, Defendants contend that Plaintiff has failed to allege a false or misleading representation, which is not preempted by federal law and which falls within the parameters of the UPA. Second, USTC asserts that Plaintiff has failed to allege damages or loss as required by the UPA.

**STANDARD OF REVIEW**

■■■ {4} A motion to dismiss tests the legal sufficiency of the complaint. *Healthsource, Inc. v. X–Ray Assocs. of N.M.,* 2005–NMCA–097, ¶ 16, 138 N.M. 70, 116 P.3d 861. For purposes of Rule 1–012(B)(6) NMRA, we accept all well-pleaded facts as true and evaluate whether the claimant could prevail under any state of facts which might be proven in accordance with the allegations of the complaint. *N.M. Life Ins. Guar. Ass'n v. Quinn & Co.,* 111 N.M. 750, 753, 809 P.2d 1278, 1281 (1991). A complaint should not be dismissed unless there is a total failure to allege some matter essential to the relief sought. *Las Luminarias of the N.M. Council of the Blind v. Isengard,* 92 N.M. 297, 300, 587 P.2d 444, 447 (Ct.App.1978).

**DISCUSSION**

**I. False or Misleading Representation**

■■■ {5} "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." *Diversey Corp. v. Chem–Source Corp.,* 1998–NMCA–112, ¶ 17, 125 N.M. 748, 965 P.2d 332. In order to state a claim under the UPA, a complaint must contain allegations to the effect that: (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person. *See generally* NMSA 1978, § 57–12–2(D) (2003); *Stevenson v. Louis Dreyfus Corp.,* 112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991).

{6} In this case, Plaintiff has alleged that: (1) Defendants falsely and knowingly misrepresented the TK–52 series buckle to be safe, defect-free, and compliant with FMVSS 209; (2) these misrepresentations were made in order to enable DCC to sell vehicles within the United States; and (3) consumers have been deceived into purchasing vehicles equipped with TK–52 series buckles. Superficially, these allegations might appear to satisfy the three essential elements enumerated above. However, they provide no information about the manner in which the alleged misrepresentations were made. This is the subject of a series of separate allegations, which may usefully be classified as the fraudulent certification theory, the conspiratorial concealment theory, and the market presence theory. We address each in turn.

**A. Fraudulent Certification Theory**

{7} Plaintiff alleges that Defendants made false or misleading representations within the scope of the UPA by fraudulently certifying that the TK–52 series belts complied with applicable federal regulatory requirements. In this regard, Plaintiff notes that vehicle manufacturers are required to "self-certify that the vehicles comply with [FMVSS 209]." Plaintiff further asserts that

> because the TK–52 series buckle could not pass the test and comply with [FMVSS

209,] ... Defendants ... adopted an internal standard [which] ... automatically exempt[ed] [the TK–52 series buckle] from partial engagement testing. By utilizing this internal standard, [Defendants] ... continued to certify all TK–52 series buckles as compliant with [FMVSS] 209, even though they are not.

{8} Defendants assert that the foregoing allegations cannot support Plaintiff's UPA claim. Four arguments have been advanced. First, Defendants assert that the fraudulent certification theory is barred by principles of federal preemption. Second, Defendants contend that the theory is premised on impermissibly indirect communications. Third, the connection with the sale of goods or services is attacked. Fourth and finally, USTC asserts that the fraudulent certification theory fails to describe any communication on its part which has a propensity to deceive.

**1. Federal Preemption**

{9} Defendants contend that Plaintiff's fraudulent certification theory is preempted by federal law on two grounds

**a. Policing Federal Agencies**

{10} First, Defendants contend that Plaintiff's fraudulent certification theory is not viable because it is premised on communications with a federal regulatory body that cannot form the basis for a private cause of action. This position finds nominal support in the case of *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). In *Buckman*, tort claims were advanced against a drug manufacturer based on the manufacturer's alleged misrepresentations to the FDA. Observing that "the relationship between a federal agency and the entity it regulates is inherently federal," *id.* at 347, 121 S.Ct. 1012, the United States Supreme Court held that private, state-law claims based a regulated entity's fraud upon a federal agency are preempted.

{11} Acknowledging *Buckman*, the New Mexico Supreme Court has observed that the states do not police fraud against federal agencies. *See Palmer v. St. Joseph Health-*

*care P.S.O., Inc.*, 2003–NMCA–118, ¶ 56, 134 N.M. 405, 77 P.3d 560 ("[P]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied." (internal quotation marks and citation omitted)). The *Palmer* court noted that in light of this principle, a private party cannot bring a state-law claim against a regulated entity, based upon the entity's alleged misrepresentation to a federal regulatory authority. *Id.*

{12} In reliance upon *Buckman*, Defendants contend that the portions of the first amended complaint which describe the certification process cannot provide a basis for Plaintiff's UPA claim because the alleged misrepresentations were essentially made to the National Highway Traffic Safety Administration (NHTSA), a federal regulatory agency, by Defendants as regulated entities. However, the first amended complaint does not indicate that Defendants misrepresented the qualities of the TK–52 series to NHTSA or to any other federal agency. The first amended complaint does not identify the audience at all. Contextually, however, it seems unlikely that Plaintiff's fraudulent certification theory is premised on communications between Defendants and NHTSA. The partial engagement testing and "self-certification" that are addressed in the first amended complaint originate with the National Traffic and Motor Vehicle Safety Act (the NTMVSA), 49 U.S.C. §§ 30101 to 30170 (2000), as further developed through applicable regulations. *See* 49 C.F.R. § 571.209 (2006) (FMVSS 209).

{13} The NTMVSA specifies that certifications, such as the self-certifications of compliance with FMVSS 209 at issue in this case, are to be addressed to dealers and distributors. *See* 49 U.S.C. § 30115(a). As a result, we cannot presume that Defendants' allegedly fraudulent certifications were directed at NHTSA. *See generally Valdez v. State*, 2002–NMSC–028, ¶ 4, 132 N.M. 667, 54 P.3d 71 (observing that a complaint must be construed in the light most favorable to the party opposing a motion to dismiss, with all doubts resolved in favor of the sufficiency of the complaint). We therefore conclude that *Buckman* is inapplicable.

### b. Classic Federal Preemption

{14} Second, Defendants suggest that the NTMVSA preempts state law, such that Plaintiff cannot proceed with his UPA claim.

{15} Federal law may preempt state law under the Supremacy Clause, U.S. Const. art. VI, cl. 2, either expressly or implicitly. "The purpose of the preemption doctrine is to allow Congress to promulgate a uniform federal policy without states frustrating it through either legislation or judicial interpretation." *Largo v. Atchison, Topeka & Santa Fe Ry. Co.,* 2002–NMCA–021, ¶ 6, 131 N.M. 621, 41 P.3d 347. Courts apply a strong presumption against preemption, particularly in areas of law that are traditionally left to state regulation. *Hennessy v. Duryea,* 1998–NMCA–036, ¶ 8, 124 N.M. 754, 955 P.2d 683; *Montoya v. Mentor Corp.,* 1996–NMCA–067, ¶ 7, 122 N.M. 2, 919 P.2d 410. The party claiming preemption must show a clear and manifest intent of Congress to preempt. *Id.* ¶ 8, 919 P.2d 410.

{16} The preemption analysis begins with the language of the federal legislation to determine whether Congress has expressed any intent to preempt state law. *See, e.g., United Nuclear Corp. v. Gen. Atomic Co.,* 96 N.M. 155, 198–99, 629 P.2d 231, 274–75 (1980). The NTMVSA contains two clauses, one which expresses a limited intent to preempt, and one which expressly 'saves' state common law claims. The first clause provides that the states may enforce only motor vehicle safety standards that are identical to the standards established pursuant to the NTMVSA. 49 U.S.C. § 30103(b). The second clause provides that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103(e).

{17} The United States Supreme Court considered the effect of these clauses in the case of *Geier v. American Honda Motor Co., Inc.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Observing that the second clause "assumes there are some significant number of common-law liability cases to save," *id.* at 868, 120 S.Ct. 1913, the Court held that the NTMVSA does not expressly preempt the entire field of automobile safety.

Accordingly, Plaintiff's UPA claim may proceed, unless an impermissible conflict is presented.

{18} "A direct and positive conflict exists when obeying state law would make compliance with federal law impossible or where state law discourages what federal law encourages." *State v. Haddenham,* 110 N.M. 149, 157, 793 P.2d 279, 287 (Ct.App. 1990). Once again, *Geier* provides guidance. The United States Supreme Court ruled that the NTMVSA preempted tort claims based on manufacturers' failure to equip vehicles with driver's side air bags. This ruling was based on a determination that the claim, by which manufacturers could be required to install driver's side air bags in all vehicles, actually conflicted with applicable federal regulations permitting manufacturers to use a variety of safety devices and establishing a gradual phase-in of such passive restraint devices.

{19} As previously mentioned, the UPA claim that has been advanced in this case does not depend in any way upon the alteration or supplementation of applicable FMVSS. Rather, Plaintiff's UPA claim is premised on allegedly unfair and/or deceptive trade practices which violate FMVSS 209. Accordingly, no conflict with applicable federal safety regulations appears on the face of the complaint. We therefore reject Defendants' preemption argument.

### 2. Indirect Representation

{20} Defendants have also attacked the viability of Plaintiff's fraudulent certification theory on grounds that it relies on representations which only reach consumers indirectly, if at all. In this regard, USTC has taken the position that a UPA claim can only be premised upon a direct representation by a defendant to a claimant. DCC has taken a more subtle position, allowing that indirect representations might theoretically support a UPA claim in a proper case, but contending that representations that never reach consumers, such as the allegedly fraudulent certifications, cannot support UPA claims.

### a. Direct Communication with Claimant

{21} The plain language of the UPA does not appear to support USTC's direct representation theory. As previously stated, the UPA prohibits misrepresentations "made in connection with the sale ... of goods or services ... by a person in the regular course of his trade or commerce[.]" Section 57–12–2(D). The conjunctive phrase "in connection with" seems designed to encompass a broad array of commercial relationships. On its face, this language does not suggest that a direct representation, by the defendant to the plaintiff, is a prerequisite.

{22} The historical purpose of the UPA further undermines USTC's argument. Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising. *See Parker v. E.I. DuPont de Nemours & Co.*, 121 N.M. 120, 132, 909 P.2d 1, 13 (Ct. App.1995). At a minimum, the focus on advertising suggests that the UPA addresses representations directed at the public at large, as consumers. If a direct representation was required, the UPA would provide no relief for false and misleading advertising disseminated to consumers generally through the media. This appears to be a strained reading of the statute. *See generally Aztec Well Servicing Co. v. Prop. & Cas. Ins. Guar. Ass'n*, 115 N.M. 475, 479, 853 P.2d 726, 730 (1993) (observing that statutory interpretation must be consistent with legislative intent and must not render the statute application absurd, unreasonable, or unjust). Moreover, such a result would conflict with existing case law. *See, e.g., Jones v. Gen. Motors Corp.*, 1998–NMCA–020, ¶¶ 2, 22–23, 124 N.M. 606, 953 P.2d 1104 (holding that misleading advertising and promotional statements, apparently directed to the public at large, were sufficient to support a UPA claim). We therefore reject USTC's argument.

### b. Indirect Communication with Consumers

{23} DCC has taken the position that if an indirect communication is to form the basis for a UPA claim, the communication must be directed at the public, as through marketing. In light of Plaintiff's failure to specify that the allegedly fraudulent certifications were directed at the public. DCC contends that the certifications cannot supply a platform for Plaintiff's UPA claim.

{24} Returning to the first amended complaint, we are again confronted with the lack of specificity as to the audience. For the reasons previously stated, we reject DCC's assumption that the alleged misrepresentations were directed to NHTSA. Considering the pertinent regulatory framework and in the absence of limiting language in the complaint, we will not limit the potential scope of the complaint in light of the legal principle that we must sustain the validity of the complaint if recovery is available under any conceivable state of facts. *See, e.g., Envtl. Improvement Div. v. Aguayo*, 99 N.M. 497, 499, 660 P.2d 587, 589 (1983) (motion to dismiss for failure to state a claim "merely tests the legal sufficiency of the complaint and is infrequently granted because its purpose is to test the law of the claim, not the facts that support it" and "is *only* proper when it appears that [a] plaintiff can neither recover nor obtain relief under any state of facts provable under the claim"); *Runyan v. Jaramillo*, 90 N.M. 629, 632, 567 P.2d 478, 481 (1977) ("In considering a motion to dismiss for failure to state a claim ... all facts well pleaded must be accepted as true, and the motion may be granted only when it appears the plaintiff cannot be entitled to relief under any state of facts provable under the claim:"); *Wallis v. Smith*, 2001–NMCA–017, ¶ 6, 130 N.M. 214, 22 P.3d 682 ("[D]ismissal is proper when the law does not support the claim under any set of facts subject to proof.").

{25} The question then becomes whether a false or deceptive statement, made by a manufacturer and its testing laboratory to a dealer or distributor, for the purpose of facilitating sales of a product to consumers at large, should fall within the scope of the UPA. As previously stated, we note that the language of the UPA is capable of encompassing a broad array of commercial relationships, and nothing expressly limits its scope to communications directed at the plaintiff or at the public. *See generally* § 57–12–2(D). The remedial purpose of the legislation, as a con-

sumer protection measure, is also consistent with the broadest possible application. *See Ashlock v. Sunwest Bank of Roswell,* 107 N.M. 100, 102, 753 P.2d 346, 348 (1988), *overruled on other grounds by Gonzales v. Surgidev Corp.,* 120 N.M. 133, 899 P.2d 576 (1995).

{26} These considerations militate in favor of construing the UPA to reach misrepresentations made by and between third parties in the course of commercial transactions, particularly when misrepresentations are designed to enable a manufacturer to sell a product to consumers, as alleged in this case. Based upon the foregoing observations, we believe this approach is most consistent with legislative intent. We therefore reject DCC's attack on the sufficiency of the complaint based upon Plaintiff's failure to specifically allege that the fraudulent certifications were communicated to the public.

### 3. Connection with the Sale of Goods in the Regular Course of Business

{27} As previously described, a UPA claim must be premised upon a false or misleading statement which is knowingly made in connection with the sale of goods in the regular course of business. *See* § 57–12–2(D). Defendants contend that even if Plaintiff's fraudulent certification theory satisfies the representation requirement, it fails to satisfy the "connection with sale of goods" requirement.

{28} As Defendants have observed, the first amended complaint contains no allegations concerning any transaction between the parties. Defendants contend that in the absence of such a transaction, Plaintiff cannot establish that any representation has been made in connection with the sale of goods. By this argument, Defendants appear to take the position that the "connection with sale of goods" requirement can only be satisfied upon a showing that the defendant made a misrepresentation when selling a product to the plaintiff.

{29} Plaintiff takes a broader view. As previously mentioned, the first amended complaint alleges that no vehicles equipped with TK–52 series buckles could have been sold in the United States absent the fraudu-

lent certifications. To the extent that the fraudulent certifications were made for the purpose of enabling sales to consumers. Plaintiff maintains that the certifications were made in connection with the sale of goods.

{30} Once again, the Court must seek indicia of legislative intent. To begin with the plain language of the statute, we note that the definition of "unfair or deceptive trade practice" makes no mention of transactions between a claimant and a defendant. *See generally* § 57–12–2(D). Nor does it require a misrepresentation *in the course of* a sale between plaintiff and defendant; it merely requires that a misrepresentation be "made *in connection with* the sale ... of goods" generally. *Id.* (emphasis added). Similarly, the UPA allows claims to be brought by "[a]ny person" who suffers damages "as a result of any" unfair or deceptive practice by another. NMSA 1978, § 57–12–10(B) (2005). These provisions appear to be crafted so as to ensure that the UPA has a broad scope—arguably, broad enough to encompass misrepresentations which bear on downstream sales by and between third parties.

{31} Turning to policy, the Court is reminded of the remedial purpose of the UPA and the principle favoring liberal application. *See State ex rel. Stratton v. Gurley Motor Co.,* 105 N.M. 803, 808, 737 P.2d 1180, 1185 (Ct.App.1987) ("Because the Unfair Practices Act constitutes remedial legislation, we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent.").

{32} With respect to existing case law, we find no published authority to suggest that a transaction between a claimant and a defendant is required. Although DCC asserts that the case of *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.,* 2005–NMCA–051, 137 N.M. 524, 113 P.3d 347, provides support for its position, we disagree. *Santa Fe Custom Shutters* rejected an invitation to expand the UPA to permit sellers to advance claims against buyers. This Court merely observed that "the UPA contemplates a plaintiff who seeks or ac-

**444**

quires goods or services *and* a defendant who provides goods or services." *Id.* ¶ 14 (emphasis added). Contrary to DCC's suggestion, the pertinent language does not require the plaintiff to acquire goods or services *from* the defendant.

{33} In summary, both the plain language of the act and the underlying policies suggest that a commercial transaction between a claimant and a defendant need not be alleged in order to sustain a UPA claim. Because we find little to counterbalance these considerations, we reject Defendants' position.

### 4. Propensity to Deceive

{34} Finally, a viable UPA claim must be premised on a representation which "may, tends to, or does deceive any person." Section 57-12-2(D). USTC argues that this requirement is not met because Plaintiff was in no way deceived by any misrepresentation in which USTC allegedly participated.

■ {35} To the extent that USTC's argument is premised on Plaintiff's failure to allege detrimental reliance, the argument has been rejected. "[T]he UPA does not require that the defendant's conduct actually deceive a consumer; it permits recovery even if the conduct only 'tends to deceive.'" *Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-027, ¶ 21, 135 N.M. 265, 87 P.3d 545. Accordingly, a claimant need not prove reliance upon a defendant's deceptive conduct in this context. *Id.* ¶ 22.

{36} USTC's argument may be focused on Plaintiff's standing. Specifically, USTC observes that Plaintiff has alleged that he owns a 1986 DCC truck which is equipped with TK-52 seat belt buckles. Plaintiff has further alleged that USTC ceased partial engagement testing in the early 1990s. Because the model year of the DCC truck predates the alleged improprieties, USTC contends that Plaintiff has failed to allege any conduct on its part which could have deceived him.

{37} USTC's argument depends upon a fairly restrictive reading of the first amended complaint. Although Plaintiff specifically alleges that "in the early 1990s. USTC stopped testing TK-52 series buckle[s] for

partial engagement." Plaintiff also alleges that USTC has performed testing to certify compliance with FMVSS 209 "at all times relevant to this Complaint." Accordingly, even if USTC did not cease partial engagement testing until after the DCC model year, the reader may rationally infer that USTC falsely certified that the TK-52 seat belts were safe, defect-free, and compliant with FMVSS 209 at the time that the DCC truck was manufactured. This Court's duty, as previously stated, is to broadly read the first amended complaint and sustain its validity if recovery is available under any state of facts provable under the claim. *See, e.g., Dellaira v. Farmers Ins. Exch.*, 2004-NMCA-132, ¶¶ 19-22 136 N.M. 552, 102 P.3d 111. We therefore reject USTC's theory.

{38} In summary, we conclude that Plaintiff's fraudulent certification theory is facially viable. Federal preemption does not present a bar. In addition, although the indirect nature of the underlying misrepresentation and the lack of a mutual transaction present arguably novel circumstances, we conclude that the broad statutory language and the remedial purpose of the UPA support the extension to third-party communications of the sort at issue here.

### B. Conspiratorial Concealment Theory

{39} Second, Plaintiff advances a theory of deliberate concealment and non-disclosure. In this regard, Plaintiff contends that Defendants "concealed from Plaintiff and the other consumers" the fact that the TK-52 series buckles are "not safe," insofar as they are "subject to partial engagement under ordinary and actual usage (*i.e.*, false latching)." Plaintiff alleges that Defendants accomplished such concealment by "embark[ing] upon a systematic campaign to deny in all cases that any problem existed and refuse to acknowledge the role played by the TK-52 series buckle in causing the injuries and deaths reported to them every year." Defendants contend that these allegations are incapable of supporting Plaintiff's UPA claim, primarily because they identify no specific representation which could be said to have given rise to a duty to disclose additional information.

{40} "The UPA ... imposes a duty to disclose material facts reasonably necessary to prevent any statements from being misleading." *Smoot,* 2004–NMCA–027, ¶ 15, 135 N.M. 265, 87 P.3d 545 (citing Section 57–12–2(D)). Accordingly, it appears that the duty to disclose only arises in relation to some *other* representation which would otherwise tend to mislead in the absence of the disclosure. Efforts to identify potential sources of *other* such representations in the first amended complaint have yielded the following possibilities: (1) the fraudulent certification theory, discussed above; (2) the denial "in all cases that any problem existed" with the TK–52 series buckles, found in paragraph 24 of the first amended complaint and quoted above; and (3) the "refus[al] to acknowledge the role played by the TK–52 series buckle in causing the injuries and deaths reported" each year, also found in paragraph 24 and quoted above. For the reasons stated, the fraudulent certification theory is viable. Although this is sufficient to satisfy our inquiry, we note that the second and third enumerated possibilities might also provide adequate support for Plaintiff's claim. In the recent case of *Jaramillo v. Gonzales,* a bank's "refusal to acknowledge liability" was deemed "a false representation" within the scope of the UPA. 2002–NMCA–072, ¶ 28, 132 N.M. 459, 50 P.3d 554. As such, Defendants' "systematic campaign to deny in all cases that any problem existed and to refuse to acknowledge the role played by the TK–52 series buckle" in reported injuries and deaths could also provide a viable platform for Plaintiff's UPA claim.

### C. Market Presence Theory

{41} Finally, Plaintiff advances a market-presence theory. It stems from paragraph 17 of the first amended complaint, which provides that "the fact that ... [vehicles equipped with TK–52 series buckles] were offered for sale ... and, as a result, are on the highways and streets of the United States, was in [and] of itself an implicit and explicit representation that the vehicles comply with [FMVSS 209]."

{42} Defendants focus heavily on this theory in their briefs to the Court, noting its novelty and vigorously challenging its viability. However, we conclude that it would be unnecessary and imprudent to pass upon the matter. For the reasons stated above, we conclude that Plaintiff's fraudulent certification and conspiratorial concealment theories are facially viable. Therefore, the district court's determination that Plaintiff adequately stated a claim for a false or misleading statement, knowingly made in connection with the sale of goods or services, is affirmable. We will limit the scope of this opinion accordingly.

### II. Damages

{43} The second prong of Defendants' attack on the sufficiency of the allegations in the first amended complaint concerns damages. USTC specifically contends that Plaintiff has failed to allege *any* cognizable injury, and it asserts that this constitutes a fatal defect.

{44} The UPA provision authorizing the recovery of damages is found in Section 57–12–10(B):

> Any person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater.

It appears that USTC interprets this provision to require a showing of some form of actual damages in order to support any monetary award. However, the New Mexico Supreme Court has applied Section 57–12–10(B) as the basis for an award of the statutory $100 minimum, even in the absence of proof of economic or property loss. *See Page & Wirtz Constr. Co. v. Solomon,* 110 N.M. 206, 211–12, 794 P.2d 349, 354–55 (1990) (stating that the claimant was entitled to recover the statutory one hundred dollars, despite his failure to produce evidence showing that the defendant's deceptive practice caused loss of money or property). More recently, this Court confirmed that "[i]n the absence of actual losses, [a] [p]laintiff is still entitled under [the] UPA to recover the statutory damages of one hundred dollars." *Jones,*

1998-NMCA-020, ¶ 23, 124 N.M. 606, 953 P.2d 1104. These authorities clearly establish that the UPA does not require proof of actual monetary or property loss.

{45} To the extent that Plaintiff seeks actual damages beyond the statutory $100 minimum, USTC contends that the allegations of the first amended complaint are insufficient as a matter of law. However, the scope of the inquiry on appeal is limited to assessing the viability of Plaintiff's UPA claim. Insofar as proof of actual, monetary damages is not an essential element of Plaintiff's claim, the sufficiency of the allegations concerning damages does not appear to be squarely presented for appellate consideration. We note, however, that USTC's argument has little merit. The first amended complaint contains allegations indicating that the alleged defect in the TK–52 series buckles: (1) has deprived the owners of vehicles equipped with these buckles of the benefit of their original bargains as purchasers, (2) has caused or will cause a diminution in value, and/or (3) is likely to cause owners of such vehicles substantial costs associated with retrofitting/repair. An award of monetary damages may be premised upon such considerations. See, e.g., Hale v. Basin Motor Co., 110 N.M. 314, 319, 795 P.2d 1006, 1011 (1990) (holding, in a UPA case involving a vehicle, that the damages could be calculated by reference to the cost of repairs, as well as diminution in value if the repairs fail to restore the property to its original fair market value). As such, the first amended complaint appears to describe the basis for Plaintiff's prayer for damages in an appropriate manner.

{46} USTC's challenge to the sufficiency of the allegations appears to focus on the nature of the alleged product defect. Specifically, USTC asserts that it is inappropriate to analogize to Hale, because no defect has manifested itself in this case. This argument stems from the ruling of a Texas appellate court. In the case of Everett v. TK–Taito, L.L.C., 178 S.W.3d 844 (Tex.App.2005), the court held that an action could not be maintained under the Texas Deceptive Trade Practices Act (TDTPA), because the allegedly unmanifested product defects did not give rise to "out-of-pocket" or "benefit-of-the-bargain" economic injuries, as required by the TDTPA. Id. at 857–58. As a basis for dismissing Plaintiff's UPA claim in this case, Everett is unpersuasive. Unlike New Mexico's UPA, the TDTPA requires actual proof of economic damages. Id. at 857. Accordingly, while a Texas claimant could not prosecute a TDTPA claim without presenting evidence of economic damages. Plaintiff may proceed with his UPA claim even if his prayer for damages appears rather speculative. Furthermore, the Everett court based its ruling in part on the claimant's failure to allege any actual failure on the part of the product in question. Id. at 858. This is the unmanifested defect argument. In this case, by contrast, Plaintiff has specifically alleged that the seat belts installed in his DCC vehicle "do, in fact, false latch[.]" Accordingly, Plaintiff's UPA claim does not appear to be premised on an unmanifested defect, and as such Hale is controlling.

{47} In summary, the issue of damages does not present a bar to Plaintiff's UPA claim. Even if Plaintiff fails ultimately to prove that he and his putative class members have suffered economic losses, they may nevertheless seek the statutory $100 minimum.

## CONCLUSION

{48} Plaintiff's complaint states a claim under the UPA which is neither preempted by federal law nor facially deficient for failure to allege an essential element. We, therefore, affirm and remand to the district court for further proceedings consistent with this opinion. We emphasize that we are simply assessing the sufficiency of the complaint and are not intimating what might develop in the future with respect to the ability of Plaintiff to support his allegations factually. We do no more than apply the legal principle that we must sustain the validity of the complaint under any state of facts subject to proof under the claim.

{49} **IT IS SO ORDERED.**

WE CONCUR: CARL J. BUTKUS and CLAY CAMPBELL, Judges, New Mexico District Court Judges (sitting by designation).