This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40586**

**MELISSA VIGIL,**

Plaintiff-Appellant,

v.

**CENTURY BANK,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Court Judge**

Osteen & Harrison, PLC
Lincoln Combs
Phoenix, AZ

Cohen & Malad, LLP
Lynn A. Toops
Lisa M. La Fornara
Arend J. Abel
Indianapolis, IN

Branstetter, Stranch & Jennings, PLLC
J. Gerard Stranch, IV
Martin F. Schubert
Nashville, TN

Johnson Firm
Christopher D. Jennings
Little Rock, AR

for Appellant

Jennings Haug Keleher McLeod LLP
Gary J. Van Luchene
Albuquerque, NM

Holland & Knight LLP
Andrew J. Soven
Philadelphia, PA

for Appellee

**MEMORANDUM OPINION**

**WRAY, Judge.**

**{1}** Plaintiff Melissa Vigil appeals the dismissal of an amended class action petition (the amended complaint) brought against Defendant Century Bank (the Bank), which alleged multiple claims relating to the assessment of overdraft and return item fees charged against Plaintiff's deposit account for debit card and certain electronic payments. Attached to the amended complaint were four agreements between the Bank and the account holder, Plaintiff, to which we refer collectively as the Agreements and individually as the 2016 Account Agreement, the 2019 Account Agreement, the 2014 Bounce Protection Disclosure, and the 2019 Bounce Protection Disclosure. The district court dismissed Plaintiff's amended complaint after finding that (1) the Agreements unambiguously permitted the Bank to charge the challenged fees in the manner that the fees were charged; (2) Plaintiff's claims were precluded because Plaintiff did not report errors or problems within the time specified in the Agreements; and (3) Plaintiff pleaded no misrepresentations or a causal connection to support a violation of the New Mexico Unfair Practices Act (the UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2019). We affirm in part and reverse in part.

**DISCUSSION**

**{2}** Because this is a memorandum opinion prepared solely for the benefit of the parties, we set forth only those facts necessary to our analysis as they become relevant. Plaintiff argues that dismissal under Rule 1-012(C) NMRA was inappropriate, because the pleadings alleged that the Bank's actions breached the Agreements and additionally violated the UPA. Rulings on Rule 1-012(C) motions for judgment on the pleadings are reviewed de novo, and we apply the general motion to dismiss standard. *Vill. of Angel Fire v. Bd. of Cnty. Comm'rs of Colfax Cnty.*, 2010-NMCA-038, ¶ 5, 148 N.M. 804, 242 P.3d 371. In that vein, we "test[] the legal sufficiency of the complaint, not the facts that support it," *see Quarrie v. N.M. Inst. of Mining & Tech.*, 2021-NMCA-044, ¶ 5, 495 P.3d 645, and accepting "all well-pleaded factual allegations in the complaint as true," dismissal is appropriate "only if the plaintiff is not entitled to recover under any theory of the facts alleged in [the] complaint," *see Hovey-Jaramillo v. Liberty Mut. Ins.*, 2023-NMCA-068, ¶ 8, 535 P.3d 747 (internal quotation marks and citations omitted), *cert. denied* (S-1-SC-40020, Sept. 12, 2023). We consider first the contract claim and then turn to the UPA claim.

**I. Plaintiff's Complaint States a Claim for Breach of Contract**

**{3}**     The district court concluded that the Agreements unambiguously permitted the Bank to charge the contested fees. Whether a contract is ambiguous is a legal question, and we review a trial's court conclusion of law de novo. *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 14, 114 N.M. 778, 845 P.2d 1232. A contract is ambiguous "[i]f the court determines that [it] is reasonably and fairly susceptible of different constructions." *Id.* ¶ 12. Importantly,

> [t]he mere fact that the parties are in disagreement on construction to be given to the contract does not necessarily establish an ambiguity. In making its determination, the court must consider the agreement as a whole. Moreover, where the terms of an agreement are plainly stated, the intention of the parties must be ascertained from the language used.

*Levenson v. Mobley*, 1987-NMSC-102, ¶ 7, 106 N.M. 399, 744 P.2d 174 (citations omitted). If there is no ambiguity, "provisions of a contract need only be applied, rather than construed or interpreted." *Id.*

**{4}**     On appeal, Plaintiff contends that (1) the Agreements do not "unambiguously allow[]" the Bank to charge overdraft fees on transactions that were authorized on a positive balance but later settled when the account balance was negative, referred to as the "Authorized Positive/Settle Negative" theory (the APSN theory); (2) because the term "item" can reasonably be read to be "the account holder's instruction for payment," the Agreements do not unambiguously permit the Bank to assess multiple fees (overdraft and return item fees) on an "item" that was returned for insufficient funds and later reprocessed (the Multiple Fee theory); and (3) because the Bank intentionally charged the contested fees, the reporting provision is inapplicable and would not preclude Plaintiff from bringing the asserted claims. We conclude first that the amended complaint does not state a claim for breach of contract under the APSN theory but does state a claim regarding the Multiple Fee theory and second that Plaintiff sufficiently alleged that the breach of contract claim is not precluded by the reporting provision.

## A.     Plaintiff's APSN Theory Does Not State a Claim for Breach of Contract

**{5}**     Regarding the APSN theory, Plaintiff argues—and the Bank disputes—that the Agreements required the Bank to assess overdraft fees at the time a transaction was authorized, as opposed to settled based on the way the Agreements (1) explain the determination of overdraft and overdraft fees; and (2) place a temporary hold on funds at the time debit card transactions are authorized. We examine each of these arguments in turn.

### 1.     Overdraft Determination Under the 2019 Account Agreement and the 2019 Bounce Protection Disclosure

**{6}**     In the amended complaint, Plaintiff alleges the general circumstances that surround a debit card transaction, as follows. When an account holder uses a debit card to make a purchase, the merchant contacts the Bank for authorization. If the Bank

authorizes the transaction, the Bank eventually settles—or pays—the transaction. In some circumstances, an account may have sufficient funds at the time the Bank authorizes a transaction but insufficient funds at the time of settlement. In those instances, the Bank assesses an overdraft fee, even though the account had sufficient funds at the time the purchase was authorized. Based on these allegations, Plaintiff argues that the imposition of this fee is a breach of the contractual promise "to determine overdrafts at authorization" because the "debit card transaction [was] authorized on sufficient funds" and the transaction "*did not* overdraw the available balance at authorization," regardless of whether the funds were available at the time of settlement. The Bank maintains that the Agreements provide that overdraft fees are assessed at the time of settlement (or payment) and not authorization. To resolve the dispute, we turn to the 2019 Account Agreement together with the 2019 Bounce Protection Disclosure, both of which Plaintiff cites in support of the APSN theory. *See McCasland v. Prather*, 1978-NMCA-098, ¶ 10, 92 N.M. 192, 585 P.2d 336 ("Our inquiry on appeal is essentially limited to the contents of the complaint and the contract which was attached to it."); *see also Ruegsegger v. Bd. of Regents of W. N.M. Univ.*, 2007-NMCA-030, ¶ 41, 141 N.M. 306, 154 P.3d 681 (explaining that "[i]n a breach of contract action, provisions that are integral to the contract may be attached to pleadings without converting the motion into one for summary judgment").

**{7}**     The 2019 Account Agreement unambiguously states that overdraft is determined at the time of payment or settlement and not authorization. Under this agreement, the account holder agrees that the Bank "may charge fees for overdrafts" and "[a]n overdrawn account will typically result in you being charged an overdraft fee or [a nonsufficient funds] fee." More specifically, this agreement states that "an overdraft occurs when there is not enough money in your account to pay for a transaction, but we pay (or cover) the transaction anyway." The agreement also warns that the "order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented" because "[t]he payment order can affect the number of items overdrawn or returned unpaid and the amount of the fees you may have to pay." The agreement does not indicate to the account holder that payment will occur in the order that the payments were initially authorized. Instead, the agreement states that payment will occur in the order defined by the agreement.[1] From these provisions, we conclude that the order in which the different types of debits and credits are "processed" determines whether there will be "enough money in your account to pay all of the items that are presented" or whether the account will be overdrawn and fees assessed.

---

[1] The agreement states: "Our policy is to process deposits/credits first, by trancode then smallest items first on the day they are processed. We process priority pay items (i.e., wires, ATM/POS transactions, cashed checks, loan payments, etc.) second, by trancode then smallest items first on the day they are processed. We process electronic debits (i.e., ACH, transfers, etc.) third, by trancode then smallest items first on the day they are processed. We process checks fourth, in numerical order (by check number) on the day they are processed. We process other debits (i.e., ATM/sweep transfers, closing withdrawals, etc.) fifth, by trancode then smallest items first on the day they are processed)."

**{8}**     Plaintiff argues that the language of the 2019 Bounce Protection Disclosure links the word "pay" to the authorization step so that overdraft fees are determined at authorization and not settlement. Those cited provisions are:

> (1) "Also, if you are a consumer and you have requested us to do so, we may *authorize and pay* ATM transfers or withdrawals and everyday debit card purchases using your Bounce Protection limit";

> (2) "Also, if you are a consumer and you have requested us to do so, we may *authorize and cover* ATM transfers or withdrawals and everyday debit card purchases";

> (3) "Also, at your request, we may *authorize and pay* ATM transfers or withdrawals and everyday debit card purchases using your limit."

(Emphases added.) Plaintiff's view of the 2019 Bounce Protection Disclosure language does not reasonably account for the provisions in the 2019 Account Agreement that we have just explained. We must read the agreements together, and "[w]e will not interpret a contract such that our interpretation of a particular clause or provision will annul other parts of the document, unless there is no other reasonable interpretation." *Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 19, 131 N.M. 100, 33 P.3d 651. As we have explained, Plaintiff has described a two-step debit transaction: authorization and settlement. The 2019 Bounce Protection Disclosure cannot link "pay" to the authorization step, as Plaintiff argues. The 2019 Account Agreement links "pay" to "processing" by determining the funds available at the time of payment based on the order that payments are processed—which we understand to be the settlement step. For both agreements to have meaning, "authorize" must be distinct from "pay" and "cover" in the 2019 Bounce Protection Disclosure. Otherwise, the two-step debit transaction process collapses into a single step and the 2019 Account Agreement provisions for determining whether funds are sufficient are nullified. Instead, the 2019 Bounce Protection Disclosure provisions that Plaintiff identifies can be reasonably read to apply the Bounce Protection "service" in the context of the entire debit transaction— both the authorization and the settlement steps. *See id.* ¶ 19 ("Apparently conflicting provisions must be reconciled so as to give meaning to both, rather than nullifying any contractual provision, if reconciliation can be effected by any reasonable interpretation of the entire instrument in light of the surrounding circumstances." (internal quotation marks and citation omitted)).

**{9}**     Plaintiff also argues that because under the Agreements, an overdraft only happens if the Bank approves or authorizes a transaction and the Bank has discretion to "honor" a transaction despite insufficient funds, an account becomes overdrawn only at the time payments are authorized and overdraft fees must be determined at the authorization stage. To establish that overdraft happens at authorization, Plaintiff cites the following 2019 Bounce Protection Disclosure provisions:

(1) "There are several ways your account can become overdrawn, such as . . . payments authorized by you (i.e. signature-based point of sale transactions)";

(2) "Your available balance may be affected by authorizations which could create additional overdrafts and associated fees";

(3) "Normally, we will not approve an overdraft for you in excess of the predetermined amount assigned to your account type."

The Bank's discretion to honor withdrawal requests that overdraw an account are found in this provision in the 2019 Account Agreement:

**Overdrafts** – You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying, or not paying, discretionary overdrafts on your account without notice to you.

We understand Plaintiff's argument to be that because the Bank decides at the time of authorization whether to pay a transaction for which there is insufficient funds, the overdraft fee determination must be made at that time as well. These provisions, however, do not address timing in relation to determining overdrafts or fees. Rather, the purpose of the cited provisions is to provide the Bank with discretion to honor or not honor requests that overdraw the account, notwithstanding the Bank's past decisions or practices. The Bank's decision to honor a debit card transaction request at the time of authorization does not mean that it determines at that time whether the account will ultimately be overdrawn or whether to impose an overdraft fee. To the contrary, the 2019 Account Agreement provisions that we have already discussed address the timing for determining overdraft and fees: overdraft occurs when there are insufficient funds in the account to pay and whether there are sufficient funds depends on the order of payment. Thus, the Bank initially decides that it will pay and when it comes time to pay, the Bank determines whether the account has sufficient funds or is overdrawn. For these reasons, Plaintiff's complaint does not sufficiently plead a breach of contract claim based on the APSN theory that overdraft determinations are made when transactions are authorized and not when they are settled.

## 2.      Available Balance and Temporary Debit Card Authorization Holds

**{10}**    Plaintiff argues that overdraft fees are determined at authorization and not settlement based on the 2019 Account Agreement's explanation of an account holder's available balance and a provision titled, "temporary debit authorization hold affects your

account balance." Again, we turn to the terms of the 2019 Account Agreement, which are as follows:

> **Determining your account balance** - [I]mportantly, your 'available' balance may not be the same as your account's 'ledger' balance. As the name implies, your available balance is the amount of funds in your account 'available' to make payments. This balance is calculated based on your ledger balance plus any unused Bounce Protection or other types of overdraft protection; minus any holds and transactions that have been authorized but not yet settled.
>
> . . . .
>
> **A temporary debit authorization hold affects your account balance** - On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money when the merchant does not know the exact amount of the purchase at the time the card is authorized. The amount of the temporary hold may be more than the actual amount of your purchase. Some common transactions where this occurs involve purchases of gasoline, hotel rooms, or meals at restaurants. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it could be three calendar days, or even longer in some cases, before the adjustment is made. *Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold.*

(Emphases added.) Based on the emphasized language, Plaintiff maintains that the held funds should be unavailable for any other purpose after authorization, which would necessarily prevent an overdraft at the time of settlement or payment. Nothing in this provision, however, requires the Bank to calculate an overdraft at the time the Bank authorizes an account holder's transaction request and places a hold on the account. The provisions cited by Plaintiff simply notify the account holder of the difference between the available and ledger balances as well as the potential risks involved in debit card purchases and explain that a hold authorizes a transaction at a higher amount than what will ultimately be due in order to account for an uncertain final purchase price. The 2019 Account Agreement does not promise that when a debit transaction involves a hold, funds are sequestered and are not available to process other payments for other types of transactions according to the order of payment provision that we have already discussed.

{11}    Other portions of the 2019 Account Agreement warn that different types of transactions "use different processing systems and some may take more or less time to post" and "keeping track of the checks you write and the timing of the preauthorized payments you set up will help you know what other transactions might still post against

your account." The 2019 Account Agreement gives the account holder no assurance that the account's available balance at authorization will remain the available balance at the time of settlement, despite any hold placed to accommodate debit card transactions. To the contrary, as we have explained, the 2019 Account Agreement defines overdraft as a transaction that cannot be *paid* with the funds in the account. For these reasons, we must agree with the Bank that "this case is *not* about whether [the Bank's] overdraft practices are proper or what a purportedly 'better' contract might say," and we conclude that Plaintiff's complaint did not state a claim relating to the APSN theory.

### B. Plaintiff's "Multiple Fee" Theory States a Claim for Breach of Contract for Transactions Related to the 2016 Account Agreement

**{12}** At the outset of the Multiple Fee theory argument, Plaintiff challenges the Bank's actions with respect to transactions entered before October 2019, which were governed by the 2016 Account Agreement and all of which were made using the Automated Clearing House (ACH) network. Specifically, these transactions may involve authorization by an account holder for a third-party vendor to seek payment from the Bank. Plaintiff's Multiple Fee theory is that the Bank had a contractual obligation to charge only one fee (returned item fee *or* overdraft fee) per "item," but if the Bank reprocesses an ACH transaction after an initial rejection for insufficient funds, unbeknownst to Plaintiff, each time the transaction is reprocessed, the Bank treats the reprocessing as "a new and unique item that is subject to yet another fee." The district court found that the Agreements make clear that "an 'item' can result in both an overdraft charge and a return fee" and that "[t]he allegation than an item can only be charged for one fee, even if it is returned multiple times is inconsistent with both the parties' [c]ontracts and the New Mexico Uniform Commercial Code." As we explain, considering the 2016 Account Agreement as a whole, the term "item" can be reasonably be read (1) to require "an account holder's instruction for payment" each time a vendor requests payment; or (2) to permit reprocessing without the account holder's reauthorization if the account has insufficient funds to pay the authorized amount. Because the agreement is "reasonably and fairly susceptible of different constructions," it is ambiguous. *Mark V*, 1993-NMSC-001, ¶ 12.

**{13}** The district court applied Article 4 of the New Mexico Uniform Commercial Code (the UCC), NMSA 1978, §§ 55-4-101 to -504 (1961, as amended through 2009), which governs bank deposits and collections and is incorporated into the 2016 Account Agreement by reference. The UCC (1) defines an "item" as "an instrument or a promise or order to pay money handled by a bank for collection or payment," Section 55-4-104(a)(9); (2) allows a bank to "charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft," Section 55-4-401(a); and (3) provides that an item is "properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank," *id.* Based on these provisions, the district court determined that "[e]ach time [the] Bank receives a promise or order to pay, it receives an item even if the item was previously presented and rejected." These provisions, however, do not clarify whether the *re*submission of a previously returned item constitutes the same item or a separate

item. While the UCC defines "item" in terms of the account holder's authorization, *see* § 55-4-104(a)(9); §55-4-401(a), neither the statute nor the Agreements indicate whether authorization must be renewed in order to resubmit a payment request after it has been presented and rejected for insufficient funds.

**{14}** Plaintiff argues that the term "item" in the 2016 Account Agreement "refers to the *account holder's* instruction for payment" and "*remains* the same item when it is reprocessed after being returned for insufficient funds." Based on this premise, Plaintiff contends that when the Bank "reprocessed" the request for payment "without her request," the Bank could not charge another fee because a merchant's resubmission does not constitute a new item—for it to be a new "item," Plaintiff would have to take "action to resubmit it" by providing a new authorization. The Bank points to the 2016 Account Agreement and the 2014 Bounce Protection Disclosure to contend that "an item is something that is presented for payment, *every time it is presented for payment*" by a merchant. As a result, according to the Bank, each time a vendor presents a request for payment, including resubmissions after rejection for insufficient funds, a new item is created that is authorized by the account holder's initial approval and the Bank can either pay the vendor, which results in an overdraft, or return the item to the vendor, which results in a returned item fee. Because the Agreements do not address the term "item" in the context of resubmissions after returned or rejected requests for payment, and both Plaintiff's and the Bank's interpretations are reasonable, we conclude that the meaning of the term "item" is ambiguous under these circumstances. *See Mark V*, 1993-NMSC-001, ¶ 13 ("In order to determine the meaning of the ambiguous terms, the fact[-]finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent."). Accordingly, Plaintiff's complaint states a breach of contract claim under the Multiple Fee theory, and we reverse the district court on this point.

## C.    Plaintiff Adequately Pleaded Compliance With the Reporting Provision

**{15}** The district court concluded that Plaintiff's claims were precluded because Plaintiff did not timely report errors or problems with the manner in which the Bank handled the account as required by the 2016 and 2019 Account Agreements. On appeal, both parties analyze only the reporting provision found in the 2019 Account Agreement, and so we, too, turn again to that agreement. *See Ruegsegger*, 2007-NMCA-030, ¶ 41. The 2019 Account Agreement states in relevant part as follows:

> **Your duty to report other errors or problems** - In addition to the Commercial Code and other state law, you agree there is a common law duty to promptly review your statement for errors in addition to unauthorized signatures, alterations or forgeries. Promptly reviewing your statement is valuable to both you and us because it can help identify, correct and prevent future mistakes.
>
> In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement

with reasonable promptness for *any other error or problem* - such as an encoding error or an unexpected deposit amount. Also, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for *any errors on items identified in that statement* and as between you and us the loss will be entirely yours. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the 60 day time period to report other errors.

(Emphases added.) On appeal, Plaintiff asserts that the 2019 Account Agreement is ambiguous and specifically contends that (1) the reporting provision does not apply to Plaintiff's claims; and (2) other courts have declined to grant motions to dismiss based on similar reporting provisions. Having reviewed the out-of-jurisdiction cases Plaintiff cites, we decline to rely on those analyses and instead review the contractual provision in the case at hand.

**{16}** In our analysis, we agree with Plaintiff that the 2019 Account Agreement is "reasonably and fairly susceptible" to different constructions and that the fact-finder must determine whether Plaintiff complied with the reporting provision. *See Mark V*, 1993-NMSC-001, ¶ 13 (explaining that if the contract is ambiguous, "the meaning to be assigned the unclear terms is a question of fact"). Plaintiff argues that the reporting requirement applies only to unintentional inaccuracies in the processing and posting of transactions as reflected on the account statements and not to the Bank's intentional practices in interpreting the agreement. The district court rejected this argument and reasoned that Plaintiff "could not have known at the time of the charged fees and receipt of [the] statements reflecting the charged fees whether they were errors or intentional acts [and a]t best . . . Plaintiff could only understand the charges to be errors under the [c]ontract or problems in need of correction." The Bank maintains that the reporting provision imposes a duty to review statements "for any other error or *problem*" and contends that "repeatedly charging overdraft fees which a customer believes cannot be charged is . . . a 'problem' in any ordinary sense of that word."

**{17}** The agreement, however, is also "reasonably and fairly susceptible" to a different construction. *See id.* ¶ 12. Though the duty to report extends to "errors or problems," the 2019 Account Agreement specifically precludes claims against the Bank only for failure to report "any *errors* on items identified in that statement." (Emphasis added.) This limited preclusion corresponds to the purpose statement of the duty provision, which explains that "promptly reviewing your statement is valuable to both you and us because it can help identify, correct and prevent future *mistakes*." Thus, the agreement can be read such that the Bank reserved an opportunity to cure errors before an account holder could bring an error-related claim but did not prevent an account holder

from pursuing a claim for other problems identified on the statement. Taking as true Plaintiff's allegation that "[t]he improper fees charged by [the Bank] were not 'errors' but rather were intentional charges made by [the Bank] as part of its standard processing of transactions" and "part of the systematic and intentional assessment of fees according to [the Bank's] standard practices," Plaintiff has appropriately pleaded compliance with the reporting provision. It remains for the fact-finder to construe the meaning of "error" and decide whether Plaintiff's or the Bank's construction is reasonable. *See id.*

## II. Plaintiff Adequately Pleaded a Claim Under the UPA Related to the Multiple Fee Theory

**{18}** Plaintiff's UPA claim, as pleaded in the amended complaint, is based entirely on the same factual assertions as the breach of contract claims. The Bank argues that the UPA claim fails because the contract claims fail and that Plaintiff did not prove damages caused by the alleged misrepresentations. To state a claim under the UPA, a complaint must allege that

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading;
>
> (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and
>
> (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 142 N.M. 437, 166 P.3d 1091; *see also* § 57-12-2(D) (defining "unfair or deceptive trade practice"). As the Bank acknowledges, it is well established that a UPA claimant need not demonstrate that they relied on a particular unfair or deceptive practice but instead only "a causal connection between the deceptive practice and the claimant's damages." *See Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-027, ¶ 20, 135 N.M. 265, 87 P.3d 545. Causation, this Court has explained, requires a nexus only "between a defendant's conduct and a plaintiff's loss." *Id.* (internal quotation marks and citation omitted). We conclude that Plaintiff did not adequately plead a UPA claim related to the APSN theory and debit card transactions for the same reason that the breach of contract claim was appropriately dismissed—because the Agreements unambiguously permit the Bank to assess fees in the manner alleged, Plaintiff cannot establish the knowing misrepresentation element of a UPA claim.

**{19}** The Multiple Fee theory allegations, however, support the UPA claim and the claim is otherwise adequately pleaded. The Multiple Fee theory alleges that through the Agreements with account holders, the Bank knowingly misrepresents the way overdraft fees will be charged and that because of that deceptive practice and contrary to the understanding of a reasonable consumer, Plaintiff and others similarly situated have

"incurred more fees than they should have and have suffered monetary damages for which [the Bank] is liable." Plaintiff additionally pleaded examples of the fees that allegedly should not have been assessed thereby demonstrating how damages could be calculated. *See Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 22, 140 N.M. 478, 143 P.3d 717 (explaining that the New Mexico Rules of Civil Procedure require only "a short and plain statement of a party's claim and a demand for relief").

**CONCLUSION**

**{20}** We affirm in part and reverse in part the district court and remand for further proceedings consistent with this opinion.

**{21} IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JANE B. YOHALEM, Judge**